444 So.2d 1088 (1984)
David ZYFERMAN and Monia Zyferman, His Wife, Appellants,
v.
Pete TAYLOR, Individually and D/B/a Taylor Industrial Sales, and Itt General Controls, Appellees.
No. 82-98.
District Court of Appeal of Florida, Fourth District.
January 25, 1984.
Rehearing Denied March 1, 1984.
*1089 Robert E. Gordon of McGee, Jordan, Shuey, Koons, & Schroeder, P.A., Lake Worth, for appellants.
Marjorie Gadarian Graham of Jones & Foster, P.A., West Palm Beach, for appellee-ITT General Controls.
GLICKSTEIN, Judge.
This is an appeal by an injured plaintiff and his wife from a final judgment entered in favor of the defendant manufacturer following entry of a directed verdict in favor of the latter.[1] We reverse and remand.
The issue is whether an injured plaintiff in a strict liability case has the burden of proving that the subject product has been used normally and maintained properly from the time of its original sale to the time of the malfunction causing the plaintiff's injuries. We hold that the injured plaintiff does not have such burden.
Since this is a case wherein the court granted a directed verdict, the facts are stated in the light most favorable to the nonmoving party. Appellant, David Zyferman, was employed as a baker in West Palm Beach on the date of the accident involved herein. When he arrived at work at about 4 P.M. on the day of the accident, he turned on the switch for the boiler to produce steam for the baking oven. This switch was located near the oven doors. Normally it took about half an hour for steam to build. At about 7 P.M., appellant noticed no steam had accumulated in the boiler; so he shut off the switch inside the back of the building near the circuit breaker and went outside to look at the boiler, which was located outside in a boiler room. There he touched the reset button on the boiler but nothing happened so he bent down and looked at the bottom and saw no pilot light. Thereupon he went into the *1090 building, took a piece of newspaper and some matches, turned off the switch near the circuit breaker, went back out, and lit a match to the paper. When he bent down to put the paper to the pilot light, there was an explosion that set his clothing on fire.
The boiler was a used one purchased from and installed by Taylor Industrial Sales several months earlier. Although Mr. Taylor could not say who had previously owned or used the boiler, he testified that the controls were those provided by the manufacturer, and had not been modified or changed.
Plaintiffs' expert witness was Walter Large, then service superintendent for Florida Public Utilities. He had inspected the boiler shortly after the explosion. It was his opinion, both at the time of the inspection and when he testified, that the cause of the explosion was "a faulty thermopilot relay, not functioning." Mr. Large stated the accident could not have happened if the relay had functioned properly. "If this device functioned in the manner in which it was intended, the currents could have not reached the main solenoid valves and the amount of gas under the boiler at the time it was relit would be minimal and, actually, I have considered it practically no hazard." Mr. Large testified that the unit was being used in its normal function and was not being used to do something it was not designed to do. He estimated that, had it not been defective, the unit could easily have lasted thirty years. Mr. Large also testified, based on photographs of the interior of the switch, that it contained corrosion and even a spider web. He speculated that operation in an area of high humidity could have caused the corrosion, because the unit was not hermetically sealed. Finally, Mr. Large testified that he saw nothing to indicate the control had been altered, changed or modified in any way.
Walter Runciman, product safety manager for ITT General Controls, had examined the thermopilot relay thirteen months after the accident. He corroborated the internal corrosion and said he doubted the unit worked on the date of the explosion. Mr. Runciman further testified he believed the control had never been opened before.
At the jury trial held herein, appellants evidently abandoned negligence and warranty theories which they had pled, judging from the testimony they presented, and relied only on strict liability. At the close of appellants' case, the court directed a verdict in favor of appellees on all three theories. As to the strict liability theory, the court indicated the plaintiff had the burden of showing the thermopilot relay had been "properly maintained and used, so that the inference can be made, because of corrosion, that is what caused this thing." In informing the jury of the directed verdict, the court said:
I think that the fact that there is a gap of nine years where we don't know where the machine was or whether or not it was being operated properly or what it was exposed to is fatally defective on the part of the plaintiff and it is my judgment that the law requires that they put on evidence, at least, that it was being properly operated and was not exposed to any other problems during that intervening period of time, which they are unable to do.
The Florida Supreme Court adopted the doctrine of strict product liability, as set forth in Section 402A, American Law Institute Restatement (Second) of Torts, in West v. Caterpillar Tractor Company, 336 So.2d 80 (Fla. 1976). The court quoted Section 402A of the Restatement, as follows:
"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
"(a) the seller is engaged in the business of selling such a product, and
"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
"(2) The rule stated in Subsection (1) applies although

*1091 "(a) the seller has exercised all possible care in the preparation and sale of his product, and
"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."
Id. at 84. It summarized the doctrine and the elements the plaintiff must establish in these words:
[S]trict liability should be imposed only when a product the manufacturer places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being. The user should be protected from unreasonably dangerous products or from a product fraught with unexpected dangers. In order to hold a manufacturer liable on the theory of strict liability in tort, the user must establish the manufacturer's relationship to the product in question, the defect and unreasonably dangerous condition of the product, and the existence of the proximate causal connection between such condition and the user's injuries or damages.
Id. at 86-87. It made the following statement of underlying policy:
The obligation of the manufacturer must become what in justice it ought to be  an enterprise liability, and one which should not depend upon the intricacies of the law of sales. The cost of injuries or damages, either to persons or property, resulting from defective products, should be borne by the makers of the products who put them into the channels of trade, rather than by the injured or damaged persons who are ordinarily powerless to protect themselves.
Id. at 92. Implied in the notion of enterprise liability is that the manufacturer can buy liability insurance and spread the cost among the buyers of the product by means of a modest price increase, whereas the injured person cannot readily insure himself against the particular hazard.
Florida does not have an extensive body of case law directly apropos of the issue on appeal. However, we can be guided by the First District Court of Appeal's decision in Cassisi v. Maytag Company, 396 So.2d 1140 (Fla. 1st DCA 1981). It is carefully written, well thought out, and gives a thorough rationale for the law that it states.
In Cassisi, the purchaser of a new home clothes dryer in which a fire started that ravaged the house gave deposition testimony that, during the nineteen months she used the dryer, there had been no maintenance work or repairs on the dryer. An expert witness could not pinpoint a specific defect but concluded from his examination that the fire emanated from the dryer and that there had to have been a malfunction in the dryer that started the fire. Nevertheless, the trial court gave summary judgment on the ground the plaintiff's proofs "failed to show their damages were caused by a product in a defective condition both at the time of the accident and the time it was within the possession of the manufacturer or the retailer." Id. at 1142. The appellate court reversed the summary judgment that the trial court had ordered, even though the plaintiff had been unable to negate alternative theories as to the origin of the fire.
The Cassisi court stated that the plaintiff's burden is to establish "(1) that a defect was present in the product; (2) that it caused the injuries complained of; and (3) that it existed at the time the retailer or supplier parted possession with the product." Id. at 1143. Acknowledging that controversy has raged over the proper test for determining a product's defective condition, the Cassisi court stated the standard under Section 402A in this manner: "Were the ordinary consumer's expectations frustrated by the product's failure to perform under the circumstances in which it failed?" Id. at 1144-45. This standard applies equally whether the defect results from a flaw in manufacturing, an error in design, or misinformation or inadequate warning. While this test is hard to apply in design defect cases, and an alternative test for those cases has been proposed, the court found it unnecessary to dwell on that *1092 problem, in that the facts of Cassisi suggest a defect in manufacture rather than design. The same is true in the present case.
The Cassisi court then discussed the nature and quantum of proof, sufficient for submission of the case to the jury, that the plaintiff must produce to establish that his injuries were caused by a manufacturing defect. Id. at 1146-51. The court rejected the rule of the line of cases exemplified by Jakubowski v. Minnesota Mining and Manufacturing, 42 N.J. 177, 199 A.2d 826 (1964), that in order to establish a causal connection between his injuries and the alleged defect the plaintiff must be able to negate all alternative possibilities as to cause. 396 So.2d at 1147; see id. at 1151. Analogizing to res ipsa loquitur, the court in Jakubowski held, as did appellees in Cassisi and the trial court in the instant case, that the plaintiff had to show that the product was not improperly handled or its condition otherwise changed after the defendant relinquished control. See 42 N.J. at 183-84, 199 A.2d at 829-30. The Cassisi court, however, found more appropriate the rule set out in Greco v. Bucciconi Engineering Company, 283 F. Supp. 978 (W.D.Pa. 1967), affirmed, 407 F.2d 87 (3d Cir.1969): "[W]hen a product malfunctions during normal operation, a legal inference, which is in effect a mirror reflection of the Restatement's standard of product defectiveness, arises, and the injured plaintiff thereby establishes a prima facie case for jury consideration." 396 So.2d at 1148. The Cassisi court noted that the practical effect of this rule is that if the manufacturer wishes to avoid a jury's consideration of the issues, the manufacturer must offer evidence showing there are no genuine issues of material fact to be resolved by a jury  rather than suggest alternative explanations of the malfunction. Id. at 1151. The court observed that this burden falls on the manufacturer even though he has relinquished exclusive control of the product, unlike the usual circumstances where res ipsa loquitur applies. Id. at 1151-52. That the defendant no longer controlled the product when the injury occurred is, however, a factor for the jury to consider in deciding whether the product was defective while it was still in the manufacturer's control. Id. at 1152. Among other factors to be considered are the age of the product, the length and severity of its use, its state of repair, its expected useful life and whether it had been used abnormally. Id. It is ordinarily for the trier of fact to weigh such evidence. Id. If, however, the defendant showed the malfunctioning product was very old, frequently repaired and too ruggedly used, such facts could negate any inference the defect occurred during manufacture, because failure of a product under such circumstances can hardly be said to frustrate the consumer's reasonable expectations. Id.
We believe that Cassisi is a correct statement of the law; and that the trial court erred in ordering a directed verdict for appellee/defendant ITT Controls. The testimony of the injured plaintiff and the expert witnesses, Large and Runciman, set up a prima facie case that the explosion that injured Mr. Zyferman was caused by malfunction of a thermopilot relay that was defective from the time of manufacture. That the accident could be alternatively explained was something the defendant could have reinforced in presenting its defense, but the plaintiff was not bound to prove normal use and proper maintenance during the life of the relay unit. Conceivably, if the defendant showed superannuation, misuse or bad maintenance, the court could thereafter direct a verdict for the defendant as a matter of law; but mere existence of alternative theories for the accident cannot be the basis for taking the weighing of the evidence out of the jury's hands.
This is not to say that the plaintiff has proven the manufacturer's liability, only that the plaintiff has adduced enough evidence to set up a dispute as to material facts that properly a jury must resolve. It may be that with or without further evidence from the defense a jury will find for *1093 the defendant. Appellee's brief nicely marshals evidence and arguments that might persuade a jury; but these are not pertinent at this juncture. The trial court erred in directing a verdict for the defendant. It is not an element of a strict liability claim that plaintiff account for the use and maintenance of the product from the time it left the manufacturer's hands to the time of the accident.
ANSTEAD, C.J., concurs.
HURLEY, J., concurs with opinion.
HURLEY, Judge, concurring.
I agree that when measured by the standard in Cassisi v. Maytag Co., 396 So.2d 1140 (Fla. 1st DCA 1981), the plaintiff in the case at bar adduced sufficient proof to withstand a directed verdict. At the same time, I believe that some of the confusion stems from the fact that this case was framed and tried on the theory of a manufacturing flaw when, in reality, the proof suggests a design defect. See Campbell v. General Motors Corp., 32 Cal.3d 112, 184 Cal. Rptr. 891, 649 P.2d 224 (1982); Barker v. Lull Engineering Co., 20 Cal.3d 413, 143 Cal. Rptr. 225, 573 P.2d 443 (1978).
NOTES
[1] The individual, Taylor, who installed the subject boiler, is a nominal appellee, the plaintiffs having entered into a settlement with him prior to trial.