**Richard BENITEZ and Karen Benitez, Plaintiffs,**

v.

**SYNTHES, INC., Defendant.**

**No. 5:00CV262–Oc–10GRJ.**

United States District Court, M.D. Florida, Ocala Division.

March 27, 2002.

Timothy Prugh, James W. Holliday, II, Prugh & Associates, P.A., Tampa, Theodore Emanuel Karatinos, Seeley & Karatinos, P.A., St. Petersburg, FL, for Richard Benitez, Karen Benitez, his wife, plaintiffs.

Michael Simon, Hardeman & Suarez, P.A., Miami, FL, for Synthes (USA), defendant.

Louise T. Sadler, Tallahassee, FL, for Florida Dept. of Educ./Vocational Rehabilitation Services, interested party.

### Summary Judgment Order

HODGES, District Judge.

In this action, the Plaintiff alleges claims of negligence and seeks damages for injuries he sustained after a Synthes intramedullary rod, which had been manufactured by the Defendant and surgically implanted in the Plaintiff, fractured inside the Plaintiff's leg. The Defendant has moved for summary judgment (Doc. 63) and the Plaintiff has responded (Doc. 77). Upon due consideration, the Defendant's motion is due to be Denied in part and Granted in part.

### Facts and Background

On June 12, 1998, Plaintiff Richard Benitez suffered severe injuries when an auto-

mobile collided with the moped he was riding. Among other injuries, both of the bones in the Plaintiff's lower left leg were broken. That same day, the Plaintiff sought medical attention and was treated by an orthopedic surgeon, Dr. Martin Freed. Dr. Freed immediately performed surgery which included debridement of the wound and reduction of the compound fracture of the left distal tibia and fibula. Dr. Freed, who had extensive experience implanting intramedullary rods (also known as "nails," "pins," "implants," and "bone screws"), also recommended a second operation to stabilize the fracture by inserting a rod in the intramedullary canal of the tibia. Dr. Freed explained to the Plaintiff that the risks of the procedure included additional vascular damage to the lower extremities, "non-healing," and "non-union" or delayed union of the fracture itself.[1] The Plaintiff consented to the second operation.

Preparing for the surgery, Dr. Freed met with a Synthes consultant, Eric Anderson, who sold an intramedullary fixation rod to Ocala Regional Medical Center for Dr. Freed to implant into the Plaintiff's leg. Dr. Freed performed the rod implantation procedure on June 15, 1998, and during the operation Anderson was present in order to assist and advise Dr. Freed regarding how to implant the device safely. Anderson observed as Dr. Freed implanted the rod into the Plaintiff's leg and, based upon his training by Synthes, Anderson believed no mistakes were made before or during surgery. Another orthopedic surgeon, Dr. John Baker, opined that Dr. Freed selected the correct size tibial rod, properly implanted the rod, and conducted the proper follow-up care.

Pursuant to the instructions and warnings included in the package insert with the Synthes rod device, the patient should be adequately instructed regarding the limitations of the implant and that physical activity and weight bearing or load bearing may cause the rod to prematurely loosen, bend, or fracture. The precautions further state "[t]he patient should understand that a metallic implant is not as strong as a normal, healthy bone and will fracture under normal weight bearing or load bearing in the absence of complete bone healing."[2] The warnings also state "[t]hese devices can break when subjected to the increased loading associated with delayed union or nonunion."[3]

During the first month following surgery, the Plaintiff used a wheelchair for mobility. Approximately two months following surgery, Dr. Freed advised the Plaintiff to begin weight bearing on the leg, so that bone fragments would oppose each other and possibly stimulate healing. The Plaintiff followed Dr. Freed's instructions and used crutches in order to move about. Dr. Baker agreed that early weight bearing is "essential" because it increases blood flow in the fracture area.

About three to four months following surgery, the Plaintiff began testing his leg under the supervision of Dr. Freed and, on Dr. Freed's advice, began to walk using a cane. Dr. Baker concurred that the purpose of the tibial implant was to enable the Plaintiff to walk on his leg.

Soon thereafter, however, in October of 1998, the Plaintiff experienced pain as he was walking in his backyard with a cane and went to see Dr. Freed. Dr. Freed examined the Plaintiff and found no evidence that the Plaintiff had been doing anything extraordinary, such as running or

---

**1.** "Non-union" means that the body does not form the bone needed to heal the fracture. *See* Doc. 63 at 2.

**2.** Ex. A to Doc. 63.

**3.** *See id.*

jumping. Dr. Freed x-rayed the Plaintiff's leg and discovered that he had a fracture through an open screw hole in the distal aspect of the intramedullary rod. The x-ray showed that the rod had broken inside the Plaintiffs leg. On November 16, 1998, Dr. Freed removed the broken rod and replaced it with another rod. Following the surgery, the Plaintiff spent a week in the hospital. By September 1, 1999, the Plaintiff's tibial fracture was at maximum medical improvement. Dr. Freed testified that the Plaintiff suffered and will continue to suffer secondary trauma, swelling, scar tissue, engorgement of the veins, pain, and muscular atrophy. Dr. Freed also testified that the second surgery contributed to those injuries and that the breaking of the rod aggravated preexisting conditions.

The rod that fractured inside the Plaintiff's leg was later identified as a rod produced in the Synthes factory in Monument, Colorado. According to Synthes' Materials Development Manager, John Disegi, the manufacturing process for a tibial rod includes milling certain kinds of features into the rod and drilling holes where the locking bolts, or screw holes, would need to be placed. Synthes, however, does not do any post-manufacturing testing on the strength of the screw holes.

The Plaintiff's metallurgist expert, John Healy, P.h.D., examined the broken rod at issue in this case and discovered defects in the form of surface cracks resulting from machining of the screw holes in the rod by the manufacturer. Healy specifically stated, "I believe [the cracks were] from the machining."[4] Healy identified one crack measuring ten microns in length which he believed caused the tibial rod to fail. Healy further opined that the presence of the cracks halved the serviceable life of the titanium alloy comprising the screw-hole of the tibial rod and made it defective. As part of his examination, Healy also tested an exemplar rod and found that it had similar surface cracks on the surface of the screw hole. Healy opined that the cracks resulted from the machining of the screw holes and were "defects" which "should have been polished out of the surface of the material."[5] Healy explained that "we looked at an exemplar and saw the same types of defects, or same type of machine damage there that produced this same type of defect."[6]

A mechanical engineer, Ricardo Galdos, P.h.D., also analyzed the fracture site of the tibial rod (as well as an exemplar rod) and determined that the rod's failure was the direct result of manufacturing defects which caused fractures and cracks to develop at the inner surface of the open screw hole.[7] Galdos explained:

I believe the root cause of this failure was a defect that was placed in this rod at the time of manufacturing, as a result through whatever the drilling process was. There doesn't appear to be any mechanism by which the effect of those potential scratches and defects are either eliminated or reduced.[8]

Dr. Baker also speculated that the rod was defective because it failed after only 16 weeks: "You would have expected there was something wrong with the nail to have failed that early."[9] Baker concluded that

---

**4.** *See* John Healy at Tab 10 to Doc. 77, pages 66, 89.

**5.** *See id.*

**6.** *See id.* at page 90.

**7.** *See* Dr. Galdos at Tab 7 to Doc. 77, pages 35–40.

**8.** Deposition of Dr. Galdos at Tab 8 to Doc. 77, page 33.

**9.** John Baker at Tab 2 to Doc. 77, pages 11, 51.

the Plaintiff had not put enough weight on his leg to affect any inference that the tibial rod was defective. Indeed, Baker determined that the Plaintiff had put so little weight on his leg that x-rays revealed he had developed osteoporosis.

In July of 2000, the Plaintiff initiated this action in Circuit Court for the Fifth Judicial Circuit in and for Marion County, Florida. The action was removed to this Court on the basis of diversity jurisdiction. The First Amended Complaint names both Richard Benitez and his wife, Karen Benitez, as plaintiffs and alleges the following claims against Defendant Synthes, Inc.: (1) strict liability/defective warning; (2) strict liability/design defect; (3) strict liability/manufacturing defect; (4) negligence; and (5) loss of consortium.

### Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the non-moving party." [10] As the Supreme Court held in *Celotex Corp. v. Catrett,* the moving party bears the initial burden of establishing the nonexistence of a triable fact issue. [11] If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element

that he or she must prove." [12] The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried. [13]

### Discussion

As a preliminary matter, the Plaintiff has conceded to summary judgment on Count I (failure to warn) and Count II (negligent design). The Court also notes that the Plaintiff has plead a fifth claim entitled "loss of consortium," which seeks damages on behalf of the Plaintiff's wife and is not addressed by the motion for summary judgment. The Court will therefore limit its discussion to Count III (strict liability/manufacturing defect) and Count IV (negligent manufacturing) which are the only claims in dispute.

 The first claim at issue is the Plaintiff's claim based upon the theory of strict liability alleging that the rod inserted into the Plaintiff's tibia was unreasonably dangerous in that it was defectively manufactured in a manner making it susceptible to crack and spontaneously break following surgery. Indeed, a manufacturer is strictly liable in tort when it places an article on the market without inspection for defects and it proves to cause personal injury. [14] In order to prove a strict liability claim, a plaintiff must show that: (1) a product (2) produced by a manufacturer (3) was defective or created an unreasonably dangerous condition (4) that proximately caused (5) injury. [15]

---

**10.** *Samples on Behalf of Samples v. Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988).

**11.** 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**12.** *Rollins v. TechSouth,* 833 F.2d 1525, 1528 (11th Cir.1987).

**13.** *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

**14.** *Rivers v. Great Dane Trailers, Inc.,* 816 F.Supp. 1525, 1531 (M.D.Ala.1993).

**15.** *Edward M. Chadbourne, Inc. v. Vaughn,* 491 So.2d 551, 552 (Fla.1986).

Although the Plaintiff's Amended Complaint alleges claims of strict liability based upon three separate theories of liability—failure to warn, negligent design, and negligent manufacturing—the Plaintiff has conceded to summary judgment for the Defendant on the claims based upon failure to warn and negligent design. Accordingly, the only strict liability claim which remains at issue is the Plaintiff's claim for negligent manufacturing.

■ In this case, the parties agree that the allegedly defective intramedullary rod was manufactured by Defendant Synthes. The Defendant argues, however, that there is no evidence that Synthes was negligent in manufacturing the rod and that there is no evidence that the rod was not manufactured as intended. The Defendant cites *Harduvel v. General Dynamics Corp.*[16], a case in which Justice Powell, Associate Justice of the United States Supreme Court, retired, sitting by designation, articulated the distinction between manufacturing and design defect claims:

> This distinction between "aberrational" defects and defects occurring throughout an entire line of products is frequently used in tort law to separate defects of manufacture from those of design.... Stated another way the distinction is between an unintended configuration, and an intended configuration that may produce unintended and unwanted results.[17]

Manufacturing defects are generally limited to situations where something goes wrong in the manufacturing process and can be distinguished from other types of product liability claims such as design defects and inadequate warning defects.[18]

Upon a review, the Court is satisfied that the Plaintiff has produced evidence sufficient to survive summary judgment on his claim of negligent manufacturing. The expert testimony of John Healy, a metallurgist, and Richard Galdos, a mechanical engineer, is sufficient evidence of the rod's defects. Both of the Plaintiff's experts stated that the alleged defect was a result of the machining process which caused cracks to develop in the screw holes. Both experts also concluded that the cracks were defects which should have been polished out of the surface of the material. As such, these defects are precisely the sort of unintended flaws which may support a strict liability claim for negligent manufacturing. In other words, the Plaintiff has presented sufficient evidence that the rod manufactured by the Defendant was defective or unreasonably dangerous in that it was susceptible to cracking due to poor workmanship in the machining process. Because factual issues exist regarding whether the rod was defective, the Defendant's motion for summary judgment is due to be denied.

■ As an additional ground for summary judgment, the Defendant also argues that there is insufficient evidence of causation. First, the Defendant argues that there is no evidence of any causal link between the existence of the machining lines and the cracks except for the unsupported statements of the Plaintiff's experts. The Defendant also argues that there is insufficient evidence of medical causation, or whether any of Benitez' symptoms were caused by the fracture of the rod.

The Court disagrees, however, and finds that the Plaintiff has adequately produced evidence which tends to demonstrate causation. For example, both of the Plain-

---

**16.** 878 F.2d 1311 (11th Cir.1989)(Powell, J., Associate Justice of the United States Supreme Court, retired, sitting by designation).

**17.** *Id.* at 1317.

**18.** *Cassisi v. Maytag Co.,* 396 So.2d 1140, 1145 (Fla. 1st DCA 1981).

tiff's experts stated that defects in the manufacturing process contributed to cracks which ultimately caused the Plaintiff's rod to fail. Similarly, the Plaintiff's physician, Dr. Freed, examined the Plaintiff and found no evidence that the Plaintiff had been putting extraordinary strain on the leg containing the rod. A medical expert, Dr. Baker, concurred that the rod was probably defective and that the Plaintiff had not put enough weight on his leg to affect his conclusion that the rod was defective. The Court also finds that the Defendant's argument regarding medical causation is without merit. There is sufficient evidence in the record, in the form of statements by Dr. Freed and Dr. Baker, to create issues of fact regarding the extent to which the Plaintiff's preexisting injuries were exacerbated by the necessity of a second surgery.

As a final matter the Court notes that the Defendant has not specifically addressed Count V, Plaintiff's claim alleging simple negligence, in its motion for summary judgment. To the extent that the Defendant's arguments in support of summary judgment regarding the products liability claims also apply to the simple negligence claim, those arguments have already been rejected. Accordingly, for the same reasons that summary judgment is improper on the negligent manufacturing claim based upon a theory of strict liability, summary judgment is also due to be denied on Count IV of the Amended Complaint which simply alleges negligence.

## Conclusion

Upon due consideration and for the foregoing reasons, the Defendant's motion for summary judgment (Doc. 63) is Denied in part and Granted in part as follows:

(1) The Defendant's motion for summary judgment (Doc. 63) is GRANTED as to the Plaintiff's claims for failure to warn and negligent design based upon the theory of strict liabil-

ity (Counts I and II of the Amended Complaint); and

(2) In all other respects, the Defendant's motion for summary judgment (Doc. 63) is DENIED.

IT IS SO ORDERED.