**Harry GARDNER and Meredith Gardner, Plaintiffs,**

v.

**FORD MOTOR COMPANY, Defendant.**

**Case No: 6:14–cv–508–Orl–18DAB**

United States District Court,
M.D. Florida,
**Orlando Division.**

Signed August 19, 2015

Jay Calvert Cooper, Law Office of Jay Calvert Cooper, PA, FT Myers, FL, Bradley L. Leger, Kassi Dee Patrick Marks, Leger Ketchum & Cohoon, PLLC, The Woodlands, TX, for Plaintiffs.

Courtney Michelle King, Scott A. Richman, Michael Correnti, McDonald Toole Wiggins, PA, Orlando, FL, for Defendant.

## ORDER

G. KENDALL SHARP, SENIOR UNITED STATES DISTRICT JUDGE

THIS CAUSE comes for consideration on Defendant Ford Motor Company's ("Ford") Motion for Final Summary Judgment (the "Motion") (Doc. 64), to which Plaintiffs Harry Gardner and Meredith Gardner (the "Gardners") responded in opposition (Doc. 88). Ford filed a reply (Doc. 93) to the Gardners' response. For the reasons that follow, Ford's motion will be granted.

### I. BACKGROUND

This case arises from a house fire allegedly originating in the engine compartment of a 2003 Ford Escape (the "Vehicle") jointly owned by the Gardners. (Doc.

¶¶ 5, 8.) In April 2007, prior to the fire, the Gardners received a recall notice from Ford, informing them that "[i]n a very small percentage of [2001–2004 model year Ford Escapes], the Anti–Lock Brake System (ABS) Module connector may have missing or dislodged wire seals ... creating a potential for an electrical short ... and in some cases ... burning odor, smoke, and/or fire." (Doc. 68–4 at 1.) Thereafter, on May 8, 2007, the Gardners took the Vehicle to AutoNation Ford, where recall work was purportedly performed. (Doc. 64 at 3.)

On or about February 23, 2011, at 10:20pm, Meredith Gardner parked the Vehicle in the garage of the Gardners' home located at 655 Weybridge Court, Lake Mary, Florida. (Doc. 1 ¶¶ 5–7.) About ten minutes thereafter, smoke began entering the house from the garage and Harry Gardner alleges that he observed the driver's side engine compartment of the Vehicle on fire. (Id. ¶ 7.) The fire eventually spread from the Gardners' garage to the rest of their house, resulting in the loss of "their home [and] all of their possessions...." (Id. ¶¶ 7, 10.) The Gardners further aver that Ford "designed, manufactured and marketed the [Vehicle], which was in substantially the same condition as when it left the possession of Ford." (Id. ¶ 11.)

According to ACISS Primary Investigation Report 11–540 (the "Fire Marshal's Report"), based on State Fire Marshal Ronald Queen's inspection of the Vehicle on February 24, 2011, "[t]he area of origin of the fire is the compartment of the [Vehicle] which ignited in the engine compartment on the driver[']s side causing significant damage to the [other vehicle in the Gardners' garage] and the structure." (Id. ¶ 8.) Additionally, the Fire Marshal's Report states that "electrical faulting in the engine compartment [of the Vehicle] on the driver's side (near the firewall) could

not be ruled out as a possible heat source." (Id. ¶ 9.)

Approximately two weeks after the fire and Fire Marshal Queen's inspection, on March 9, 2011, "a joint examination [of the Vehicle] was conducted at [the Gardners'] residence." (Doc. 64 at 6.) David Cheers and Bob Hallman attended on behalf of the Gardners' insurance company while Larry Helton represented Ford at the inspection. (Id.) On the same day, the Gardners sold the Vehicle to their insurance company. (Id. at 7.)

On December 5, 2013, the Gardners filed their complaint (the "Complaint") in the United States District Court for the Eastern District of Michigan. (See Doc. 1 at 1.) In the Complaint, the Gardners assert two causes of action: one for negligence and one for product liability. (Id. ¶¶ 14, 21.) On March 28, 2014, United States District Judge Lawrence P. Zatkoff entered an order (Doc. 11) granting Ford's motion to transfer venue (Doc. 9) to the Middle District of Florida. (See Doc. 11 at 2.) On December 31, 2014, Ford moved the Court for judgment on the pleadings (Doc. 37), which the Court granted in part and denied in part. (Doc. 56.)

Thereafter, the parties filed several non-dispositive motions that the Court referred to United States Magistrate Judge David A. Baker. Specifically, the Gardners filed a Motion to Compel Defendant to Produce All Materials from Expert Larry Helton (Doc. 54), a Motion to Exclude Opinions of Ford's Non–Retained Expert Bob Hallman (Doc. 61), a Motion to Exclude Opinions of Ford's Retained Expert Ralph Newell (Doc. 62), and a Motion to Exclude Opinions of Ford's Retained Expert Greg West (Doc. 63); Ford filed a Motion to Strike Plaintiffs' Expert K. David Cheers (Doc. 66).

On June 3, 2015, Magistrate Judge Baker issued an order (the "Daubert Order") on the aforementioned motions (Doc. 99).

As set forth in the Daubert Order, Judge Baker ordered Ford to produce Larry Helton's notes, excluded Bob Hallman as an expert, limited the approved scope of Greg West's admissible expert testimony, and admitted David Cheers as an expert, but only for the purposes of fire origin analysis. (*Id.*) The Daubert Order also denied the Gardners' motion to strike Ralph Newell. (*Id.* at 7–10.) On July 9, 2015, the Court approved the Daubert Order, which it construed as a report and recommendation. (Doc. 111.)

After receiving Helton's notes, the Gardners filed a Motion for Leave to Depose Larry Helton (Doc. 105), which the Court referred to Judge Baker. On July 13, 2015, Judge Baker granted the Gardners' motion and allowed both parties to file a seven (7) page supplemental brief within ten (10) calendar days of Larry Helton's deposition (Doc. 112). On August 3, 2015, both the Gardners (Doc. 119) and Ford (Doc. 120) filed supplemental briefs concerning the impact of Larry Helton's notes and deposition testimony on the motions currently pending before the Court.

Ford now moves the Court for final summary judgment on all counts, pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Doc. 64.)

## II. LEGAL STANDARD

A court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Disputed issues of material fact preclude the entry of summary judgment, but factual disputes that are irrelevant or unnecessary do not. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In determining whether the moving party has satisfied its burden, the Court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party may rely solely on the pleadings to satisfy its burden. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A nonmoving party bearing the burden of proof, however, must go beyond the pleadings and submit affidavits, depositions, answers to interrogatories, or admissions that designate specific facts indicating there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. "A fact is material only when the dispute over it has the potential to change the outcome of the lawsuit under the governing law if found favorably to the nonmovant." *Zaben v. Air Prods. & Chems., Inc.,* 129 F.3d 1453, 1455 (11th Cir.1997). If the evidence offered by the non-moving party is merely colorable, or is not significantly probative, the Court may grant summary judgment. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. Put another way, "unsupported speculation [ ] does not meet a party's burden of producing some defense to a summary judgment motion [because] [s]peculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Cordoba v. Dillard's, Inc.,* 419 F.3d 1169, 1181 (11th Cir.2005) (emphasis in original) (internal quotation marks omitted) (citation omitted). Similarly, summary judgment is mandated against a party who fails to prove an essential element of its case "with respect to which [the party] has the burden of proof." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

## III. ANALYSIS

In the Motion, Ford argues that summary judgment is appropriate because the Gardners cannot prove the exis-

tence of an alleged defect in the Vehicle and because the Gardners cannot prove proximate causation. (Doc. 64 at 24.) In response, the Gardners isolate eight (8) genuine issues of material fact that they believe preclude entry of final summary judgment in favor of Ford. (*See* Doc. 88 at 1–2.) Additionally, in their Supplemental Briefing in Opposition to Ford's Motions for Summary Judgment (Doc. 119), the Gardners allege that Larry Helton's notes and deposition testimony create several additional genuine issues of material fact. (*See* Doc. 119.) Strict product liability actions in Florida require a plaintiff "to prove that (1) a product (2) produced by a manufacturer (3) was defective or created an unreasonably dangerous condition (4) that proximately caused (5) injury." *Edward Chadbourne, Inc. v. Vaughn*, 491 So.2d 551, 553 (Fla.1986) (citing *West v. Caterpillar Tractor Co.*, 336 So.2d 80, 86 (Fla.1976)). Negligence actions require a plaintiff to "allege the existence of a duty, breach of that duty, causation, and damages." *Horton v. Freeman*, 917 So.2d 1064, 1066 (Fla. 4th DCA 2006) (citations omitted). And "[f]or claims in negligence and strict liability, a plaintiff must first prove that the product was defective ... [because] [i]n general, proof of a defect determines a breach of duty under a negligence theory and the presence of an unreasonably dangerous condition under a strict liability theory." *O'Bryan v. Ford Motor Co.*, 18 F.Supp.3d 1361, 1366–67 (S.D.Fla.2014) (citations omitted).

Since "Ford only challenges the defect and causation elements" of the Gardners' claims, the Gardners attempt to link each alleged genuine issue of material fact to the defect and causation elements of their negligence and product liability causes of action. (*See* Doc. 88 at 19.) The Court will consider each of the Gardners' purported genuine issues of material fact in turn.

### a. Whether the ABS Module Connector was Actually X–Rayed as Claimed and Whether the ABS Module Connector X–Rays, If they Were Performed, Say what Hallman Claims

The Gardners argue that the deposition testimony of Ford's expert Bob Hallman "based on x-rays [of the ABS connector] he allegedly had taken at a laboratory" creates two genuine issues of material fact. (Doc. 88 at 12.) First, the Gardners dispute "whether [the x-rays] ever existed[,] creat[ing] an inherent fact issue that can only be determined by a jury"; second, "if [the x-rays] were performed," the Gardners contend that whether they "say what Hallman claims" creates a separate issue of material fact. (*Id.* at 1–2.)

Hallman's deposition testimony concerning the alleged x-rays of the ABS connector cannot create a genuine issue of material fact. Since the Daubert Order excluded Hallman's deposition testimony as "too speculative to be considered reliable," the contents thereof are unable to create a material fact issue. (*See* Doc. 99 at 5–7.) Thus, because the existence and content of the alleged x-rays are no longer genuine issues of material fact to this case, any fact disputes concerning same are insufficient to preclude entry of summary judgment in Ford's favor.

### b. Whether a Defect in the 2003 Ford Escape Caused Plaintiffs' Injuries and Whether a Fire that Starts in An Engine Compartment of a Parked Vehicle in the Middle of the Night is a Malfunction During the Normal Operation of the Vehicle, Sufficient to Establish a Prima Facie Case of Product Liability and Negligence Under a Cassisi Inference

The Gardners next argue that there is a genuine issue of material fact as to

"[w]hether a defect in the [Vehicle], where the fire originated, caused [the Gardners'] injuries." (Doc. 88 at 2.) Similarly, the Gardners aver that "[w]hether a fire that starts in an engine compartment of a parked vehicle in the middle of the night is a malfunction during the normal operation of the vehicle [ ], which establishes [a] prima facie case of product liability and negligence under the *Cassisi* inference, requiring [the] case to go to the jury[,]" is a separate genuine issue of material fact. (*Id*) Though the Gardners couch the defect question and *Cassisi* question as two distinct fact issues, the *Cassisi* inference is simply a vehicle the Gardners may use to establish a defect. That is, rather than positing two discrete fact issues, the Gardners in actuality argue that they can prove a single genuine issue of material fact—the existence of a defect in the Vehicle—two different ways. First, the Gardners aver that they are entitled to a *Cassisi* inference, which independently establishes an inference of defect. (*Id.* at 15–16.) Alternatively, the Gardners believe that, even without the aid of a *Cassisi* inference, they can establish the existence of a defect in the Vehicle. (*See id.* at 6–8.)

### a. Applicability of Cassisi

In support of their *Cassisi* argument, the Gardners posit that "[t]here is no question that a vehicle that catches on fire (especially in an engine compartment or when the origin of an ABS connector [sic] ) once it is turned off and parked in [a] garage malfunctions and would not do so but for a defect." (Doc. 88 at 16.) The Gardners also lean on their eyewitness account of "the first few minutes of the fire" and "expert testimony stating that the fire started where the ABS module connector was located...."(*Id.*) Ford counters that the Gardners' "attempt to rely upon the *Cassisi* inference [ ] is misguided and wholly unsupported by the relevant case law." (Doc. 93 at 5.)

*Cassisi v. Maytag Co.*, 396 So.2d 1140 (Fla. 1st DCA 1981), is a seminal Florida products liability case holding that "evidence of the nature of an accident itself may, under certain circumstances, give rise to a reasonable inference that the product was defective because the circumstances of the product's failure may be such as to frustrate the ordinary consumer's expectations of its continued performance." *Id.* at 1146 (quotations omitted). In the words of the Eleventh Circuit, *Cassisi* stands "for the proposition that when a product malfunctions that would not malfunction but for a defect, a plaintiff is entitled to an inference of a defect." *Worsham v. A.H. Robins Co.*, 734 F.2d 676, 683 (11th Cir.1984). In *Cassisi*, the plaintiff "left her home with [a] dryer in operation; upon her return, she found [her] house ravaged by fire." *Cassisi*, 396 So.2d at 1142–43. The plaintiffs' expert, "a registered professional engineer," could not identify a specific defect due to the extensive damage to the dryer, but nonetheless opined that the malfunction "was caused by an electrical short within the dryer." *Id.* The *Cassisi* Court explained that while many cases appropriate for a *Cassisi* inference "involve[ ] products either lost or destroyed, the inference is not dependent solely upon such facts" and that a plaintiff is "not required to exclude every possible [alternative] source" of an injury. *Id.* at 1150–51.

 Before a plaintiff can invoke *Cassisi*, they must establish the product in question falls within the class of products contemplated by the *Cassisi* court. *See id.* at 1151–62. Two factors are particularly instructive: control and condition. *See id.* Control relates to the level of agency an individual exercises over the operation of a product. *See id.* So, "products such as television sets, electric stoves, clothes washers or dryers, which can be activated

by human agency simply by turning a switch or pushing a button, but which are otherwise self-operating" represent prototypical examples of products that fall squarely within the *Cassisi* doctrine. *Id.* In contrast, car accidents "may not necessarily give rise to the same generous inference of defect." *Id.* A product's condition is also important to application of *Cassisi*; the age, length of use, severity of use, state of repair, frequency of maintenance, and other related factors all inform the condition inquiry. *Id.* at 1152. For example, the *Cassisi* Court found the inference "particularly appropriate" because the plaintiffs had "expert's testimony indicating a malfunction in the dryer was the cause of the fire, [ ] the product had never been serviced or repaired, and [it] had been normally operated during its 19 months' use." *Id.* at 1152–53. Integrating both the control and condition analyses into a single example, the *Cassisi* Court observed that "there is less cause for the application of the product defectiveness inference to a situation in which an automobile with 50,000 miles [ ] suddenly veers off the road … because … there are too many possible reasons for explaining the accident …" *Id.* n. 27.

Since *Cassisi*, there have been a number of Eleventh Circuit cases interpreting and refining the doctrine. In order to successfully invoke *Cassisi*, the Eleventh Circuit requires that a plaintiff "point to evidence that the cause of the accident most probably originated in the product." *Worsham*, 734 F.2d at 683. In *Woliciki–Gables v. Arrow International*, the Eleventh Circuit held that the *Cassisi* inference was inapplicable where the plaintiffs' experts testified that a spinal pump "could have" malfunctioned but the experts were "unable to exclude alternative possible causes for a [pump] to fail…." *Wolicki–Gables v. Arrow Int'l, Inc.* 634 F.3d 1296, 1302 (11th Cir.2011). Likewise, in *Beauregard v. Continental Tire North America, Inc.*, the

Eleventh Circuit affirmed the district court's denial of a *Cassisi* inference where the plaintiff's expert could not definitively testify that a tire malfunction was the result of a defect and where the tire was over eleven (11) years old, had over 30,000 miles on it, the tire's maintenance and storage history was largely unknown, and the manufacturer had not been apprised of any issues relating to the tire model in question. *Beauregard v. Cont'l Tire N. Am., Inc.*, 435 Fed.Appx. 877, 880–81 (11th Cir.2011). And in *O'Bryan v. Ford Motor Co.*, the court prohibited a *Cassisi* inference because the plaintiffs' "own experts admitt[ed] to not being able to rule out other causes of [a vehicle] fire," "investigators of the fire determined that the cause [of the fire] was undetermined," and the plaintiffs' expert—a fire cause and origin expert—could only testify as to the cause or origin of the fire, not a potential defect. *O'Bryan v. Ford Motor Co.*, 18 F.Supp.3d 1361, 1367–70 (S.D.Fla.2014). On the other hand, in *McCorvey v. Baxter Healthcare Corporation*, a divided Eleventh Circuit panel held that a *Cassisi* inference was warranted where the plaintiff's two experts testified as to the malfunction and there was "absolute positive proof" of the subject catheter malfunctioning. *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257–60 (11th Cir.2002).

■ *Cassisi* is uncalled for in the case at bar because the Gardners cannot establish that the cause of the fire "most probably" resulted from a defect in the ABS connector. Put simply, the facts at bar are not amenable to a *Cassisi* inference. Unlike the year and a half old, never-repaired *Cassisi* dryer, the product here is an eight (8) year old vehicle with over 80,000 miles, that has been subjected to multiple repairs. (Harry Gardner Dep. 20:16–23:5.) And unlike a dryer, which is operated simply by pushing a few buttons,

operation and maintenance of a vehicle and its engine requires substantial human agency of the sort not contemplated by the *Cassisi* Court; indeed, *Cassisi* explicitly noted that the malfunction of a vehicle with 50,000 miles is likely outside the scope of the *Cassisi* doctrine because of the inherent control and condition issues associated with such a product. *See Cassisi*, 396 So.2d at 1152, n. 27. Considering the totality of its condition, the Vehicle is analogous to the 30,000 mile, eleven (11) year-old *Beauregard* tire, which the Eleventh Circuit held was outside the purview of *Cassisi*. *See Beauregard*, 435 Fed. Appx. at 880–81.

Furthermore, as in *O'Bryan*, *Beauregard*, and *Wolicki–Gables*, there is no admissible expert testimony definitively identifying a defect as cause of the injury.[1] *See Wolicki–Gables*, 634 F.3d at 1302 (plaintiffs' experts testified that the "catheter connector could have malfunctioned, [but that] they were unable to exclude alternate possible causes for a connector to fail...."); *Beauregard*, 435 Fed.Appx. at 880 (plaintiff's expert testified that a tire detachment could have been due to a defect but "admitted that such a detachment could be the result of [multiple alternative causes].""); *O'Bryan*, 18 F.Supp.3d at 1367–70 (plaintiffs' expert couldn't omit alternative causes of the fire, couldn't testify as to defect, and all experts agreed the cause was undetermined). In fact, the furthest the Gardners' expert, David Cheers, goes is to opine that the fire patterns in the Vehicle "show similar damage consistent with the fire originating in the reported location of an anti-lock brake module electrical connector." (Doc 68–19 at 2.) Thus, Cheers does not—indeed cannot, per the Daubert Order—establish or even

insinuate that a defect caused the fire in question. And the Gardners' eyewitness testimony is also insufficient to demonstrate a defect because although they witnessed part of the fire, the Gardners did not witness the genesis of the fire. (Meredith Gardner Dep. 41:24–45:11.) Furthermore, the Court does not need an expert to note that a vehicle fire can occur for a host of reasons other than a defect. In short, the instant case is not appropriate for a *Cassisi* inference because the condition and control factors preclude it, the case law establishes that the Vehicle is outside the class of permissible *Cassisi* products, and the available expert and lay testimony is insufficient to demonstrate that a defect more probably than not caused the fire.

*b. Establishing Defect Without Cassisi*

■ The Gardners alternatively argue that, even without the benefit of *Cassisi*, they can establish a genuine issue of material fact as to the defective nature of the Vehicle's ABS connector. (*See* Doc. 88 at 14.) As evidence therefore, the Gardners point to Cheers' "identif[ication] [of] the origin of the fire as the ABS module connector and [his] testi[mony] that the fire started in the ABS module connector[,]" the Gardners' testimony "as to what they observed in the first few minutes of the fire[,]" the fact that the ABS connector "was a recalled part—meaning its defect was both known and established by [Ford] itself[,]" the Fire Marshal's report, and the "evidence in this case of other incidents which are similar, if not identical, to what happened to [the Gardners]." (Doc. 88 at 15–19.) Ford replies that the Gardners "fail to present any evidence, including physical evidence or expert testimony, to

---

1. Per the Daubert Order, the only admissible experts are K. David Cheers and Ralph Newell. (Doc. 99 at 7–10, 14–18.) The Daubert Order explicitly foreclosed any defect testimo-

ny from Cheers, whose untimely supplemental affidavit attempted to opine as to defect or cause. (Doc. 99 at 16–18.)

establish that the subject ABS module connector was defective." (Doc. 93 at 3.)

The Gardners are unable to demonstrate a genuine issue of material fact as to whether a defect in the Vehicle caused their injuries. Perhaps the closest the Gardners come to establishing a defect is Cheers' opinion that the "fire patterns observed [in another vehicle] are similar to those observed in the [Vehicle] [and] show similar damage consistent with the fire originating in the reported location of an anti-lock brake module connector." (Doc. 68–19 at 2.) However, this opinion is plainly unable to create a genuine issue of material fact as to a defect in the Vehicle. Even assuming the other vehicle fire Cheers is comparing to the instant fire is in fact similar—despite the lack of any evidence demonstrating such—the report at best opines that the fire patterns suggest the fire could have originated in the ABS connector. Reading this as establishing a defect would conflate causation with defect, which the Court will not do. Stating that a fire started at or near a location does not establish that such fire was caused by a defect at or near that location. In any event, the Daubert Opinion made clear that while Cheers may render an expert opinion in his capacity as a fire origin expert, "Cheers has no stated expertise in product defects, sufficient to support a conclusion that the ABS module or connector was defective and thus caused the fire." (*See* Doc. 99 at 16.)

The Gardners' other defect arguments are similarly unavailing. Despite the Gardners' argument to the contrary, "a manufacturer recall does not admit a defect in a particular product, but [instead] refers to the possibility of a defect in a class of products." *Bailey v. Monaco Coach Corp.*, 350 F.Supp.2d 1036, 1045 (N.D.Ga.2004) (citation omitted); *see also Harley–Davidson Motor Co., Inc. v. Carpenter*, 350 So.2d 360, 361 (Fla. 2nd DCA 1977) (holding that recall letters are not admissible to show that a defect exists in a particular product). Ford's recall letter essentially confirms this, stating that only three (3) percent of the pertinent class of vehicles will actually possess a defect. (Doc. 68–7 at 1.) Both the Gardners' eyewitness testimony and the Fire Marshal's report are similarly speculative; the Gardners did not witness the beginning of the fire and so cannot identify an ignition location with any specificity, let alone the presence of a defect, while the Fire Marshal's report simply observed that the "area of origin was on the driver side of the engine compartment [of the Vehicle] . . . and electrical faulting in the engine compartment on the driver's side (near the firewall) could not be ruled out as a possible heat source." (Meredith Gardner Dep. 41:24–45:1; Doc 68–13 at 7.) Neither observation comes close to proving a defect caused the fire.

Finally, the Gardners contend that "there is evidence in this case of other incidents which are similar, if not identical, to what happened to [the Vehicle]." (Doc. 88 at 18–19.) Ford protests that the Gardners base their arguments on a handful of complaints received by Ford's customer call center and posted to safecar.gov which are "unverified, self-reported . . . [and] which completely fail to identify whether the recall was performed and only allege that the fire (or smoke) was observed under the hood." (Doc. 93 at 9.) "Evidence of other accidents may be relevant to show . . . the existence of a design defect." *Miller ex rel. Miller v. Ford Motor Co.*, No. 2:01–cv–545–FtM–29DNF, 2004 WL 4054843, at *3–4 (M.D.Fla. July 22, 2004). However, "[b]ecause there is a strong potential for prejudice resulting from the admission of evidence of other accidents," the Eleventh Circuit imposes special conditions on the admissibility of such evidence.

*Id.* Prior similar incidents are only admissible if (1) the proponent makes a showing that the prior accidents are "substantially similar" to the occurrence in question, (2) the prior accidents are not "too remote [in] time" from the occurrence in question, and (3) the probative value of the evidence outweighs any potential prejudice or confusion of the issues. *Borden, Inc. v. Fla. E. Coast Ry. Co.*, 772 F.2d 750, 755 (11th Cir.1985) (citation omitted).

The Gardners fail to make this required admissibility showing for their proffered evidence of other accidents. Other than a conclusory assertion that the "evidence of other similar incidents meets each of these elements[,]" the Gardners decline to provide any substantial similarity argument, describe the timeframe or basic factual information relating to these other alleged accidents, and never even attempt to argue that the probative value of the evidence is outweighed by its prejudicial effect. (*See* Doc. 88 at 18–19.) In fact, the only substantial similarity argument comes from Ford, which posits that the National Highway Traffic Safety Administration ("NHTSA") is only aware of a single 2003 or 2004 Ford Escape that allegedly experienced a post-recall key-off fire (the type of accident alleged by the Gardners), and the agency has been unable to pinpoint the cause of that fire. (Doc. 93 at 9–10; West Dep. 254:21–258:10.) Even overlooking the Gardners' fatal admissibility errors and Ford's similarity counter-argument, the Gardners' evidence of other accidents is wholly speculative. That some other cars, with unknown mileages, unknown maintenance records, and unknown owner histories might have caught fire for unknown reasons is not enough to generate a genuine issue of material fact as to a potential defect in the ABS module connector of this specific vehicle.

Ford also supplies affirmative evidence that a defect was not present in the ABS module connector of the Vehicle. According to Ford's recall letter, "an ABS malfunction [ ] would illuminate the ABS warning light...." (Doc. 68–7 at 1.) However, during their depositions, the Gardners both testified that they never witnessed the ABS light illuminate on the Vehicle's dashboard. (*See* Harry Gardner Dep. 18:2–19–24; Meredith Gardner Dep. 25:15–26:5.) Additionally, upon receipt of the recall notice, the Gardners brought the Vehicle into AutoNation Ford so that the recall work could be performed. (*See* Doc. 68–10.) The Gardners do not provide any evidence that either the technician that performed the recall work or AutoNation Ford performed faulty recall work in the past. (*See* Doc. 64 at 3–5.) Nor do the Gardners provide evidence that the Vehicle itself was subjected to improper maintenance. (*Id.*)

In sum, the Gardners' evidence, individually and as a whole, amounts to "unsupported speculation[,]" which "does not create a genuine issue of fact." *Cordoba*, 419 F.3d at 1181. Pitting the Gardners' speculative arguments against Ford's affirmative evidence of a lack of a defect in the Vehicle, it is clear that Ford is entitled to summary judgment on the issue of defect.

 d. *Whether There Were Other Fires in 2003 Ford Escapes When they Were Not Running, and, in Some Cases, After the Recall Work was Performed and Whether the Recall Work was Either Not Done or Not Done as Claimed by the Ford Dealership or was Done Incorrectly*

Two of the Gardners' purported genuine issues of material fact relate to potentially deficient recall work. One alleged issue questions whether other 2003 Ford Escapes experienced fires while not running and, potentially, after receiving recall work; the other asks whether the Vehi-

cle's recall work was either not done at all or done improperly. (Doc. 88 at 1–2.) The Gardners rely on two items of evidence to support their argument—the aforementioned post-recall complaints to Ford and safecar.gov, and a supplemental recall letter sent by Ford. (*Id.* at 18–20.) On October 9, 2009, Ford sent "Safety Recall 07S51—Supplement # 2" to its United States dealers. (Doc. 68–12 at 1.) This letter informed Ford dealers that "[s]ome Anti-lock Brake System (ABS) module and connector inspections are being claimed but not completed as directed in the repair instructions" leading to "[s]ome customers [ ] report[ing] that ABS warning lights, melted connectors, smoke, or fire incidents have occurred on vehicles that have had the field service action completed." (*Id.*)

Whether there were other fires in 2003 Ford Escapes either before or after recall work was performed is not a genuine issue of material fact sufficient to preclude entry of summary judgment in this case. As the Court has already noted, in order to invoke evidence of other accidents, the Gardners must establish that the other accidents are substantially similar, acceptably close in time, and that their probative value outweighs their prejudicial effect. *See Borden, Inc.,* 772 F.2d at 755 (11th Cir.1985) (detailing the three-part test). Although both the supplemental recall letter and the alleged complaints provide evidence of other accidents, they do not provide enough details concerning those accidents to satisfy the tripartite test, especially in light of Ford's unrefuted argument that the other accidents are appreciably dissimilar. (*See* West Dep. 254:21–258:10.) Further, the Gardners fail to fill those factual gaps and provide next to no description of these other alleged accidents. And even if the Gardners convinced the Court to consider these other accidents, they would still be unable to overcome Ford's motion for fi-

nal summary judgment because the Gardners decline to supply any non-speculative evidence of defect specific to the Vehicle. *See Valencia v. Sanborn Mfg. Co.,* No. 04–21416–CIV, 2005 WL 5957819, at *15 n. 5 (S.D.Fla. Aug. 11, 2005) ("These 'other accidents,' without more, do not support an inference [of defect].").

Nor is there a genuine issue of material fact as to whether the Vehicle's recall work was performed improperly or not at all. In order to make this argument, the Gardners must rely on the. aforementioned other accidents, which they are unable to do. Essentially, the Gardners couple the fact that some other vehicles may have experienced fires after receiving the recall work with Ford's admission that some vehicles received improper or nonexistent recall work, to argue that the accident at bar could be the result of inadequate recall work. There are multiple issues with this line of argument. Most obviously, the other accidents the Gardners invoke have not been proven to be reliably similar. And the mere fact that Ford admitted to a defect in some vehicles and to the faulty nature of some of its repair work in other vehicles is not enough to demonstrate a defect in *this* vehicle. *See Bailey v. Monaco Coach Corp.,* 350 F.Supp.2d 1036, 1045 (N.D.Ga.2004) (citation omitted) ("[A] manufacturer recall does not admit a defect in a particular product, but [instead] refers to the possibility of a defect in a class of products"); *see also Harley–Davidson Motor Co., Inc. v. Carpenter,* 350 So.2d 360, 361 (Fla. 2nd DCA 1977) (holding that recall letters are not admissible to show that a defect exists in a particular product). Other than the fact that a fire occurred—which is plainly insufficient on its own—the Gardners compile no evidence indicating that this particular recall work was performed inadequately. There is no argument that either the specific technician or the specific Ford dealer possess a

history of inadequate recall work or a pre-disposition towards same. Further, there is no evidence that this specific recall work was improperly performed. In short, the idea that defects or fires in other vehicles can establish a defect or fire in the Vehicle, without specific evidence that the instant recall was improperly performed, is speculative and therefore unable to create a genuine issue of material fact.

### f. Whether the Fire Originated in the Engine Compartment of the Vehicle and Whether the Fire Originated in the Location of the ABS Module Connector

As two further grounds for opposing summary judgment, the Gardners posit that "[w]hether the fire originated in the engine compartment of the [Vehicle]" creates a genuine issue of material fact, as does "[w]hether the fire originated and started in the location of the ABS module connector which was a defective, and therefore, recalled part." (Doc. 88 at 1.) Ford counters that these issues are not enough to establish causation or defect. (*See* Doc. 93 at 1–2.)

While whether the fire originated in the engine compartment of the Vehicle is a genuine issue, it is an immaterial one. Both the Fire Marshal's investigation report and David Cheers' expert report support the Gardners' position that the fire originated in the engine compartment of the Vehicle. (*See* Doc. 68–13 at 7; Doc. 68–19 at 1.) Specifically, the Fire Marshal's report opines that "[b]urn patterns and fire tracking in the interior indicated that the area of origin was on the driver side of the engine compartment of [the Vehicle]." (Doc. 68–13 at 7.) Cheers' report similarly

deduces that "the fire originated within the engine compartment of the [Vehicle]" and that the bum patterns "show similar damage consistent with the fire originating in the reported location of an antilock brake module connector." (Doc. 68–19 at 1–2.) However, Ralph Newell's expert report opines that "[t]here is no evidence the fire originated inside the [Vehicle's] engine compartment due to the large amount of combustible products still remaining including radiator hoses, rubber hoses, plastic components and materials that would normally be consumed under a steel hood if the fire had originated inside the engine compartment." (Doc. 62–2 at 3.) Considering the totality of the evidence, it is evident that there is a credible dispute as to whether the fire began in the engine compartment or not.

Unfortunately for the Gardners, it is not enough to demonstrate a genuine factual dispute; that factual dispute must also be material. Assuming the Gardners were able to conclusively establish that the fire originated in the Vehicle's engine compartment at trial, they would still be unable to prove causation or defect. Neither the Fire Marshal's report nor Cheers' report conclude that the subject ABS connector caused the fire. Moreover, neither report demonstrates that a defect was the cause of the fire in question.[2] All that leaves the Gardners with is the assumption that because a fire starts in an engine, the engine must have a defect, which in turn must have started the fire in question. Of course, a fire starting in a vehicle's engine is not definitive proof of a defect, let alone proof that the alleged defect caused that fire.

---

**2.** Even if the Court were to consider Cheers' excluded supplemental testimony, the Gardners would be unable to establish a genuine issue of material fact. That affidavit merely states that "[t]he fire started at the location of the ABS module connector," which still falls short of opining that the ABS module connector ignited the fire. (Doc. 88–15 at 2–3.) And, Cheers gets the Gardners no closer to proving defect, as the Daubert Order limited the scope of his testimony to fire origin analysis. (Doc. 99 at 18.)

And while the second averred issue of material fact, whether the fire originated in the location of the ABS module connector, gets the Gardners nearer to a material issue, it too falls short. Just as proving that a fire started in the Vehicle's engine compartment does not prove that the fire was caused by a defect in the ABS module connector or that such an unestablished defect caused the fire, demonstrating that a fire started in the location of the ABS module connector does not prove that it was defective or that the alleged defect caused the fire. Though Cheers' testimony, if believed, narrows the origin location of the fire, it does not establish either that the ABS connector was defective or that it caused the fire. Taken to its furthest possible conclusion, all Cheers' report does is suggest that a fire might have started in or near the ABS module connector. Put another way, Cheers offers no opinion as to any potential defect and gives the Court no insight into what might have caused the fire, be it a defect or another alternate cause. Thus, even allowing that the Gardners could establish that the fire started at the location of the ABS connector—which Cheers' report stops short of doing—that fact would be immaterial to the defect and causation elements of their claims as it does not have "the potential to change the outcome of the lawsuit under the governing law . . . ." *See Zaben,* 129 F.3d at 1455.

### g. Additional Alleged Genuine Issues of Material Fact Created by Larry Helton's Notes and Deposition Testimony

In their Supplemental Briefing in Opposition to Ford's Motions for Summary Judgment, the Gardners contend that Larry Helton's notes concerning the Vehicle and his deposition testimony create additional genuine issues of material fact. (Doc. 119 at 1–2.) First, the Gardners repeatedly invoke Helton's testimony that "[a]s fire investigators, when we say origin, we mean origin and cause." (Doc. 119 at 1; Helton Dep. 92:23–92:24.) The Gardners go on to suggest that "[t]he Fire Marshall [sic] and Cheers' use of the term origin, as fire inspectors, by Helton's own explanation, establishes the ABS module as both the fire origin and cause." (Doc. 119 at 7.) That is simply not the case. No expert opines that the ABS module definitively caused the fire, let alone that it started in the connector, to the exclusion of all other components near the connector. Even assuming Cheers correctly isolated the fire origin areas as the "reported location of an anti-lock brake module connector," such a conclusion is still a far cry from conclusively determining that the fire started in the ABS module connector, or that a defect caused it. (*See* Doc. 68–19 at 1 –2.) Helton's deposition testimony highlights this, as he pointed to several flammable engine components—fuel lines, the brake fuel reservoir, the air filter, and rubber hoses—positioned in the immediate area of the ABS module connector. (Helton Dep. 240:10–244:1.) Furthermore, Helton cannot speak on behalf of the Fire Marshal, Cheers, Newell, or any other fire cause and origin expert. While Helton might believe that fire cause and origin are one and the same, no other expert has testified to that effect; further, Helton testified that his notes do not identify the area of origin as the ABS module connector, let alone the left rear engine compartment. (*See* Helton Dep. 245:14–19.) The fact that a single fire investigator considers cause and origin one and the same does not create a genuine issue of material fact, particularly when no expert or eyewitness testimony can narrow the origin of the fire to a single engine component, let alone a defect in said engine component.

Next, the Gardners posit that Helton "now disputes what his indication on his Notes means, [and] by so doing [ ] raises a genuine issue of material fact for the jury."

(Doc. 119 at 2–3.) Specifically, the Gardners believe that Helton's testimony "raises genuine issues of material facts, if it does not outright establish, that the ABS module is the cause of the fire in this case .... " (*Id.* at 3.) As the Court has already explained, Helton's testimony and notes fail to create a genuine issue of material fact as to causation and defect and certainly do not establish same. The Gardners also fail to make clear how Helton "now disputes what his indication on his Notes means." (*Id.*) Helton's position appears to be quite clear; when circling the left rear section of the Vehicle's engine compartment on his notes, Helton was indicating "a heavy area of damage in the [V]ehicle ... [n]ot the area of origin." (Helton Dep. 245:5–19.) This explanation is uncontroverted and plausible, given the prompt on the notes directing Helton to "[h]ighlight impact damage *or* fire origin and spread." (Doc 119–2 at 1.) Perhaps most importantly, even if Helton's notes conclusively identified the origin and cause of the fire as the left rear engine compartment, such a factual finding would still fall short of creating a material fact issue since it cannot establish that a defect caused the fire or that the fire actually began in the ABS module connector itself. Thus, Helton's testimony concerning the meaning of his notes does not raise a genuine issue of material fact sufficient to preclude entry of summary judgment.

The Gardners also aver that Helton's deposition casts doubt on the veracity of Ralph Newell's expert opinions. (Doc. 119 at 2.) This argument stems from the fact that Helton "never told Newell that the left front [of the engine compartment] was the origin." (*Id.*) While the Gardners correctly describe Helton's testimony, the testimony fails to raise a genuine issue of material fact. (*See* Helton Dep. 192:18–193:6.) As an initial matter, the Court is precluded from "mak[ing] credibility determinations of its own." *Ga. State Con-*

*ference of the NAACP v. Fayette Cnty. Bd. of Comm'rs,* 775 F.3d 1336, 1343 (11th Cir.2015) (citation omitted). Accordingly, the Court declines to evaluate the credibility of Newell's opinions, but does note that Helton's deposition makes clear his belief that Newell's opinions are compatible with Helton's notes and that Newell accurately represented his communications with Helton. (*See* Helton Dep. 222:1–25; 261:6–14.) Regardless, Newell's credibility cannot create a genuine issue of material fact because even if the jury wholly discounted Newell's testimony, the Gardners would still be unable to prove causation or defect, as the law requires them to do. As a result, any purported conflict between Newell and Helton's opinions does not raise a genuine issue of material fact.

Finally, the Gardners assert that "Helton's [n]otes also mention NHTSA acknowledging hundreds (100s) of post-recall fires in Ford Escapes—exactly what Plaintiffs contend happen[ed] in this case." (Doc. 119 at 6.) Helton's notes do note that a "[r]ep[resentative] from NHTSA state[ed] [that] over 100 fires [occurred] in vehicles after recall repair [work was] done." (Doc. 119–2 at 4.) However, this one-sentence, detail-devoid notation suffers from the same threshold admissibility defects afflicting the Gardners' prior evidence of other accidents. That is, although the Court is permitted to consider evidence of other accidents in design defect cases, the Gardners fail again to satisfy the Eleventh Circuit's required admissibility analysis. *See Miller ex. Rel. Miller v. Ford Motor Co.,* 2004 WL 4054843, at *3–4; *see also Borden, Inc.,* 772 F.2d at 755 (holding that evidence of similar accidents are only admissible when the moving party demonstrates that (1) the accidents are "substantially similar," (2) not "too remote [in] time," and (3) the probative value of the evidence outweighs any potential prejudice or confusion of the issues). The

Gardners decline to make even a rudimentary admissibility showing, effectively asking the Court to assume away the Eleventh Circuit's tripartite admissibility test, which the Court will not do. And the Gardners' error is compounded by Ford's unrefuted arguments that other model year Ford Escapes had "an additional recall related to a differently designed brake reservoir cap [not present on the Vehicle]," that the NHTSA representative later authored a report "explain[ing] and clarify[ying] that NHTSA is only aware of one 2003–2004 Ford Escape model year [vehicle] that has ever had a post-recall key-off fire," and that the same NHTSA representative declined to provide Helton with any factual details of the other alleged key-off fires. (Doc. 120 at 3–4; *see* Helton Dep. 252:10–253:10.) In sum, Helton's reference to other key-off vehicle fires in his notes does not produce a genuine issue of material fact.

## IV. CONCLUSION

Despite a valiant effort, the Gardners are not able to overcome Ford's Motion for Final Summary Judgment. Because the Gardners' only evidence of defect and causation, two essential elements of their claims, is speculative at best, final summary judgment must be granted to Ford. *See Cordoba*, 419 F.3d at 1181 ("[u]nsupported speculation [ ] does not meet a party's burden of producing some defense to a summary judgment motion [because] [s]peculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is the primary goal of summary judgment."); *see also Celotex*, 477 U.S. at 322, 106 S.Ct. 2548 (summary judgment must be entered against a party who fails to prove an essential element of its case "with respect to which [the party] has the burden of proof").

For the foregoing reasons, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendant Ford Motor Company's Motion for Final Summary Judgment (Doc. 64) is **GRANTED**.

2. The Clerk of the Court is directed to **ENTER JUDGMENT** accordingly in favor of Defendant Ford Motor Company. The Complaint (Doc. 1) is hereby **DISMISSED** with prejudice.

3. All other pending motions are **DENIED as moot**.

4. The Clerk of the Court is directed to **CLOSE** this case.

**DONE** and **ORDERED** in Orlando, *19* day of August, 2015.